(No. 79-CC-0080—
HENRY ROSS CONSTRUCTION, Claimant, *v*. THE STATE OF ILLINOIS, Respondent.

*Opinion filed December 29, 1988.*

*Order on Petition for Reconsideration filed November 29, 1990.*

BONO, GOLDENBERG, HOPKINS, BILBREY & HENDRICKS (MARK C. GOLDENBERG, of counsel), for Claimant.

NEIL F. HARTIGAN, Attorney General (CHARLES S. WATSON, Assistant Attorney General, of counsel), for Respondent.

## OPINION

RAUCCI, J.

This is a claim brought by two Claimants, Henry Ross, hereinafter called "Ross," and Henry Ross Construction Company, Inc., hereinafter called "Company." The claim was to recover damages allegedly resulting from the violation by the Illinois Department of Transportation, hereinafter called "IDOT," of the provisions of the Illinois Highway Code. (Ill. Rev. Stat. 1975, ch. 121, par. 4—510).

Ross was one of seven beneficiaries of the Green Acres Trust Number Two. In 1976, that trust owned certain unimproved real estate south of the city of Edwardsville in Madison County, Illinois. Prior to and during 1976, IDOT was engaged in planning a highway to be constructed in the east-west direction south of Edwardsville. This highway would intersect Route 159, and would travel through approximately the middle of the Green Acres Trust Number Two.

In accordance with section 4—510 of the Illinois Highway Code cited above, IDOT prepared a map showing the location and approximate widths of the rights-of-way needed for this highway. The highway was to be known as F.A. Route 207. The map was recorded in the office of the Madison County recorder. On April 30, 1976, a notice of the approval of the map, and filing with the county recorder, was sent by registered mail to the trustees of Green Acres Trust Number Two.

At that time the Highway Code, section 4—510 cited above, provided in part:

"The Department [of Transportation] may establish presently the approximate locations and widths of rights of way for future additions to the State highway system to inform the public and prevent costly and conflicting development of the land involved.

The Department shall make a survey and prepare a map showing the location and approximate widths of the rights of way needed for future additions to the highway system. The map shall show existing highways in the area involved and the property lines and owners of records of all land that will be needed for the future additions and all other pertinent information. Approval of the map with any changes resulting from the hearing shall be indicated in the record of the hearing and a notice of the approval and a copy of the map shall be filed in the office of the recorder of deeds for all counties in which the land needed for future additions is located.

Public notice of the approval and filing shall be given in newspapers of general circulation in all counties where the land is located and shall be served by registered mail within 60 days thereafter on all owners of record of the land needed for future additions.

The Department may approve changes in the map from time to time. The changes shall be filed and notice given in the manner provided for an original map.

After the map is filed and notice thereof given to the owners of record of the land needed for future additions, no one shall incur development costs or place improvements in, upon or under the land involved nor rebuild, alter or add to any existing structure without first giving 60 days notice by registered mail to the Department. This prohibition shall not apply to any normal or emergency repairs to existing structures. The Department shall have 45 days after receipt of that notice to inform the owner of the Department's intention to acquire the land involved; after which, it shall have the additional time of 120 days to acquire such land by purchase or to initiate action to acquire said land through the exercise of the right of eminent domain. When the right of way is acquired by the State no damages shall be allowed for any construction, alteration or addition in violation of this Section unless the Department has failed to acquire the land by purchase or has abandoned an eminent domain proceeding initiated pursuant to the provisions of this paragraph.

Any right of way needed for additions to the highway system may be acquired at any time by the State or by the county or municipality in which it is located. The time of determination of the value of the property to be taken under this Section for additions to the highway system shall be the date of the actual taking, if the property is acquired by purchase, or the date of filing of a petition for condemnation if the property is acquired through the exercise of the right of eminent domain rather than the date when the map of the proposed right-of-way was filed of record."

24

On May 24, 1976, one of the trustees wrote to IDOT to acknowledge receipt of the April 30, 1976, notice. The letter also provided IDOT with 60 days' notice of the trustees' intention to incur further development costs on the site. IDOT then responded by a letter dated June 10, 1976, wherein it informed the Trust that IDOT "* * * at this time, does not intend to acquire the needed right-of-way from the tract which is involved in the shopping center site." Since the trust had also requested that this site have access to State Route 159, the IDOT letter of June 10, 1976, further advised that the request for access had been reviewed. The letter went on to inform the trustee that he would be contacted by the permits engineer.

On November 9, 1976, Ross wrote a letter to IDOT that referred to IDOT's letter of June 10, 1976. Ross advised that he had acquired rights from Green Acres Trust Number Two to build the shopping center, "* * * and on the strength of the above-mentioned letter have gone in motion." While the letter was signed by Ross in his capacity as president of the Company, testimony at the hearing revealed that Ross personally acquired the rights from the trust by virtue of an option dated July 3, 1976. The option was to give Ross personally the right to purchase from the trust by December 4, 1976, the land for the limited purpose of developing and constructing a Kroger food store and related stores on the premises. Ross went on in his letter to ask that IDOT again tell him what plans it has for the land.

On November 18, 1976, Ross met with representatives of IDOT and secured a letter reaffirming IDOT's letter of June 10, 1976. The November 18, 1976, letter went on to notify Ross that IDOT "* * * at this time, does not intend to acquire the needed right-of-way from the tract which is involved in the shopping center site."

Ross proceeded to expend about $12,000 on engineering and related studies to prepare for the construction of the shopping center. The shopping center was to be constructed in that portion of the land north of the proposed right-of-way for F.A. Route 207. Before any actual construction could commence, IDOT sent Green Acres Trust Number Two a letter, dated February 25, 1977. That letter notified the trust, purportedly in accordance with Section 4—510 of the Highway Code, that IDOT "* * * does intend to acquire the needed right-of-way for the subject route from the tract known as Green Acres Trust Number Two." The letter proceeded to rescind the letter of June 10, 1976, and went on to state that IDOT expected to make an offer to purchase the land in approximately 90 days.

Claimant Ross was president of the Claimant Company. Ross intended to own the land with his wife, and the Company would actually develop the shopping center. Ross and his wife would then lease the completed improvements to Kroger and other businesses. Ross secured a lease agreement with the Kroger Company on September 23, 1976, for a term beginning July 1, 1977, and extending for 20 years.

Claimant Company had arranged to develop the shopping center as a general contractor. It had retained certain limited construction work for itself. Evidence was presented to show the future rental profits and tax benefits expected by Ross. Evidence was also presented to show the expected profits to the Company as general contractor and the actual expenses of the Company in preparing for development.

After the letter of February 25, 1977, IDOT entered into negotiations with Green Acres Trust Number Two to purchase the land. In his capacity as one of the trust

beneficiaries, Ross refused to agree to any purchase agreement which would not in some way reimburse him for his and the Company's expenses and lost future profits. Therefore, IDOT sought, as part of the purchase negotiations, to attempt to meet these demands.

In the course of several meetings, it was finally suggested that Ross secure an option to purchase from the trust a portion of the land lying south of the proposed right-of-way of F.A. Route 207. This is referred to as site B. The initial shopping center development plans were on site A, which lay north of the proposed right-of-way. Ross agreed to investigate the feasibility of site B. Engineering studies for that purpose revealed that estimated construction costs on site B would be approximately $243,000 greater than on site A. This was primarily because the land contours on site B would require significant additional earth work to provide proper draining. This difference far exceeded the profit margin expected by the Company in its construction contracts, which had already been let by the Company. Therefore, Ross and IDOT representatives sought to determine whether IDOT could pay any or all of this excess as part of the purchase by IDOT of the land needed for the proposed right-of-way. Ross secured a new option on site B.

IDOT then inquired of the Attorney General's office as to whether such additional expenses could be included as a portion of the purchase price. IDOT officials were advised that such expenses were not an element of the value of the land condemned nor an element of damages to the remainder not taken. IDOT therefore refused to include such expenses in the purchase price. Ross therefore decided not to purchase the land, and the Company canceled its development

project. Ross then terminated the proposed lease with Kroger, although he later testified that Kroger would have accepted the development on either site A or site B. He also stated that Kroger would have kept its commitment on the lease if site B had been developed.

Ross continued to refuse to consent to the sale by Green Acres Trust Number Two of the right-of-way land to IDOT. As a result, condemnation proceedings were instituted by the State against the trustees in the circuit court of Madison County. Ross and the Company then sought to intervene and to pursue their claim for damages by way of counterclaim against the State. The circuit court allowed the intervention by Ross and the Company. On appeal, however, the appellate court reversed and held that such alleged damages were not an element in the condemnation proceedings. The appellate court went on to rule that such a claim must be brought in the Court of Claims. (*Department of Transportation v. McGovern* (1982), 103 Ill. App. 3d 461, 431 N.E.2d 437.) Both Claimants have based their claim for damages upon the provisions of section 4—510 of the Highway Code. Claimants specifically argue that IDOT violated the provisions of the sixth paragraph of that section by failing to inform Claimants or the trust of IDOT's intention to acquire the land within 45 days after receipt of either the trustee's letter of May 24, 1976, or Ross' letter of November 9, 1976. Claimants argue that the same paragraph provides for damages to the Claimants because of the sentence which reads: "When the right-of-way is acquired by the State, no damages shall be allowed for any construction, alteration or addition in violation of this Section unless the Department has failed to acquire the land by purchase or has abandoned an eminent domain proceeding initiated pursuant to the

provisions of this paragraph." We find that the Claimants have misconstrued the meaning and intent of this statute.

The meaning of a statutory provision is derived from an examination of the language of the statute and its purpose. The statute must be evaluated as a whole, and each provision should be construed in connection with every other section or part. The statute shall also be construed in light of the general purposes of the statute. (*Miller v. Department of Registration and Education* (1979), 75 Ill. 2d 76, 387 N.E.2d 300.) Since there are no decisions from any reviewing court construing section 4—510 of the Highway Code, the legislative purpose must be first examined. That purpose is stated in general terms initially as "* * * to inform the public * * *" of future additions to the highway system and to "* * * prevent costly and conflicting development of land involved." IDOT is then directed to survey "* * * and prepare a map showing the location and approximate widths of the rights-of-way needed for further additions * * *" The map is then to be recorded with the county recorder and notice to be given to the affected owner. Thereafter, owners of affected land are prohibited from improving the affected land without specific notice of intent to IDOT. IDOT is then given an opportunity to initiate procedures to acquire the land either by purchase or by condemnation. The obvious purpose of this legislative scheme is to allow the State to acquire the land before its value is increased by improvements and to thus keep down the costs of land acquisition. The specific provision of the statute at issue in this litigation is that part which provides, "When the right-of-way is acquired by the State, no damages shall be allowed for any construction, alteration, or addition in violation of this Section * * *."

The key phrase therein is "* * * in violation of this Section." It is a basic canon of statutory construction that relative or qualifying phrases are to be applied to words immediately preceding the phrase, not those more remote. (*City of Mt. Carmel v. Partee* (1979), 74 Ill. 2d 371, 385 N.E.2d 687.) Hence, the sentence refers to damages for "* * * construction, alteration or addition * * *" made in violation of the provisions of section 4—510. The only such land improvement possible is that made by a landowner without giving the proper notice to IDOT. Damages are therefore only allowed for improvements for which the proper notice has been given to IDOT.

When that sentence is read in context, it is obvious that its purpose is to prevent an owner from recovering damages for the value of improvements which do not comply with the notice requirement at the time the right-of-way is acquired. If the State fails to acquire the land by purchase or abandons condemnation proceedings brought in accordance with the schedule outlined in the preceding sentence, then the owner can recover damages. If the landowner should rely upon the failure of the State to acquire by purchase or upon the failure of the State to condemn within the required time after the State gives notice of intent to acquire, then such a landowner would be justified in making improvements without needing to give the notice to the State. The improvements which were not the basis of the notice would then be included in an eminent domain proceeding as an element of the owner's loss. Hence, the provision in question is simply a legislative limitation on damages and condemnation and therefore, has no application to this claim.

The Claimants raise two additional issues. The first is whether the Claimants are entitled to damages not

specifically authorized by the statute because of the alleged non-compliance by IDOT with the notice of intent to acquire provision.

In order to prevail upon this issue, IDOT would in fact have to have failed to abide by the terms of section 4—510 of the Highway Code. All that this section required IDOT to do in response to a notice to develop or improve affected land is to inform the owner within 45 days of its intent to acquire. The owner must then place no improvements on the land, or he risks being in violation of the statute. If IDOT informs the owner, as it did here, of no intention to acquire, the owner may proceed to improve the affected land. IDOT will then have to pay an increased price for the land if they acquire it. This is to be resolved by the acquisition process, including eminent domain if applicable, and not by a separate claim in the Court of Claims. Unfortunately, Claimants do not fall within that category, as has already been decided by the Illinois Appellate Court when Claimants sought to assert their claim in the condemnation proceedings. Moreover, it is clear from the wording of the statute that IDOT need only give its notice of intent to acquire to protect itself from an increase in the value of the affected land by improvement. The statute does not mandate that IDOT give an affirmative notice unless IDOT wishes such protection. The statute also does not prohibit IDOT from giving a notice of intent later than 45 days after receipt of the notice of intent to improve.

In determining whether a cause of action is to be implied from a statute, it is necessary to consider at least whether the Claimants are within the class the statute was designed to protect and whether the loss or injury is one the statute was designed to prevent. (*Sawyer Realty*

*Group, Inc. v. Jarvis Corp.* (1982), 89 Ill. 2d 379, 432 N.E.2d 849.) The general protection of this statute is afforded to the State so as to prevent excess cost in the taking of land for highway purposes. To a limited degree, it also protects owners who violate its notice provisions in certain expressly defined instances. The loss the statute was designed to prevent was extra expense in acquisition for costs by the State. So long as an owner complied with the terms of the notice requirements, any improvements he placed on the land enhanced the value of the land in the event of a subsequent acquisition by the State. Therefore, the first requirement to imply a cause of action would be met since the Claimants had an interest in the land to be taken and clearly complied with the notice requirements.

The second requirement has not been satisfied by the Claimant. The statute specifically does not prohibit IDOT from giving a notice of intent to acquire later than 45 days after receipt of the notice to improve. It expressly limits when damages may be recovered for construction made in violation of the owner's notice requirements. The statute therefore was never designed to apply to the Claimants' situation. It was designed to apply only in eminent domain proceedings.

In addition, the statute in question was never designed to prevent an act of IDOT similar to those that IDOT did, in fact, take in this case. IDOT simply did not violate any of the provisions of this statute. Therefore, the loss suffered by the Claimants herein was never intended to be in a class of those losses dealt with by section 4—510. Therefore, the Claimants have no implicit cause of action under that statute.

Claimants have also argued a possible claim for fraudulent misrepresentation. Section 790.20 of the

Court of Claims Regulations provides that practice before this Court shall be governed by the Rules of the supreme court. Illinois Supreme Court Rule 341 (e)(7) provides that points not argued are waived. (*Western Casualty and Surety Co. v. Brochu* (1985), 105 Ill. 2d 486, 475 N.E.2d 872.) The issue of fraudulent misrepresentation had either not been properly raised or abandoned prior to now. However, because there is adequate evidence in the record to make a finding on this issue, we will briefly consider it.

The evidence before the Court indicates that negotiations between IDOT and the Claimants were only as to a possible purchase price of the affected land from the trust. Both Ross and the witnesses from IDOT acknowledged this. There was never a definite offer or representation from IDOT which could be accepted by the Claimants. IDOT clearly advised Claimants that its negotiations were just that and were subject to subsequent approval by other State authorities. In addition, the IDOT negotiating personnel had no authority to bind the State. *Bellini v. State* (1982), 35 Ill. Ct. Cl. 701.

As to the issue of fraudulent misrepresentation, we simply do not find that the Claimants have proven a case. Both the IDOT letters stated that IDOT did not intend "* * * at this time" to acquire the land in question. There is no evidence that any IDOT representative or employee knew such statement was false or negligently made such statement when he could have reasonably ascertained it to be false. In fact, there is no evidence that the statements were false at the time they were made.

For all the reasons stated above, we hereby deny this claim.

33

## ORDER ON PETITION
## FOR RECONSIDERATION

RAUCCI, J.

This cause coming on to be heard on the Claimant's petition for reconsideration, due notice having been given, and the Court being advised;

Having carefully considered Claimant's petition and having heard oral argument on the issues raised therein, it is hereby ordered that Claimant's petition be, and hereby is, denied.